CASE 112—ACTION FOR TRESPASS TO LAND AND INVOLVING THE TITLE THERETO—OCTOBER 14.

# Kentucky Land & Immigration Company v. Crabtree, &c.

### APPEAL FROM LEE CIRCUIT COURT.

JUDGMENT FOR DEFENDANTS AND PLAINTIFF APPEALS. AFFIRMED.

LAND—BOUNDARIES—COURSES—DISTANCES—NATURAL MONUMENTS — POSSESSION—EXTENT—CONTINUITY OF TITLE—SOURCE—EVIDENCE —TRIAL—EQUITABLE ISSUES—DETERMINATION— JURY — SUBSEQUENT ACQUIREMENT OF TITLE BY WARRANTOR—WILLS—PROOF OF PROBATE—CERTIFICATE—FORM—JUDGMENT—COLLATERAL ATTACK.

Held: 1. Where parties having conflicting claims to uninclosed forest lands are each in actual possession of but a part of their claims, the possession of the land not actually occupied attaches to the better title.

2. Where the proper location and direction of courses described in a deed are in dispute, they should be so run as to conform to and touch the natural objects stated, rather than in accordance with given angles.

3. Where a course can not be run so as to touch all the natural objects called for, that course should be taken which will satisfy the most of the calls for natural objects.

4. A boundary line may be proven by evidence of reputation of its existence as an ancient line.

5. In an action for damages for trespass on realty, where defendant pleaded *liberum tenementum*, evidence HELD to show a perfect chain of title to the land in controversy from the Commonwealth of Virginia to defendant.

Kentucky Land & Immigration Co. v. Crabtree, &c.

6. The possession of one having a valid and superior title to land is not disseised by the possession of one claiming that land as part of a larger tract, and having actual possession of a portion of such larger tract, but no inclosure on, or actual physical possession of, the tract claimed by both.

7. In an action involving title to realty, where one party showed a continuous chain of title from the original source of title, deeds offered by the other party not connecting with the original source of title were not competent to show title in the party offering them, but were properly limited to showing the extent of that party's claims and possession.

8. Where the holder of an inferior title to land claims by adverse possession as against the holder of the superior title, the possession will not be construed to extend to land not inclosed.

9. In an action for damages for trespass on realty, defendant alleged his ownership of the land on which the alleged trespasses were committed, and, by amendment during trial, denied plaintiff's ownership of any of the land claimed by it in its complaint. Plaintiff sought a continuance to produce certain evidence to complete its chain of title. This evidence, if its effect and truth were conceded. showed title only to land, the title to which was not in dispute, HELD, that refusal of the continuance was not error.

10. Plaintiff sued for damages for trespass on realty, and defendant pleaded *liberum tenementum*, and alleged that the boundaries in a certain deed had been changed by fraud or mistake. The court heard evidence as to this alleged change, and determined the issue. HELD, that thereafter the cause was a common law action and was properly triey by a jury.

11. An owner of land sold the same, and afterwards purchased an interest in the same land, but failed to pay the purchase price, whereupon the vendor foreclosed his lien, and the land was sold. HELD, that the purchaser at the foreclosure sale derived title from the vendor, and not the vendee, and so did not derive title from the same source as did the purchaser of vendee's first title.

12. An owner of land sold the same, and afterwards purchased an interest in the same land, but failed to pay the purchase price, whereupon the vendor foreclosed his lien, and the land was sold. HELD, that as the second title acquired by the original owner was but an equitable one, and was extinguished by the enforcement of the vendor's lien, it could not be regarded as having been acquired for the vendee of the original title, under the rule that, where a warrantor acquires another title after sale, he will be held to have acquired it for his first grantee.

13. A deed was signed, "James M. B.," and the certificate of ac-
knowledgment stated that "this deed from James M. B. was this
day produced by said John L. B.," etc.    HELD, that it was ap-
parent that the words "John L." were a mistake, and the certifi-
cate was sufficient.

14. In an action involving title to land, where one of the convey-
ances in defendant's chain of title was a will, the clerk of the
couny of testator's residence certified a copy of the will as
"a true copy, as is certified of record." The certificate
of record was as follows: "I, E. W., clerk of the
county court, . . . do certify that the foregoing writ-
ing, the last will . . . of P., deceased, was produced
and handwriting proven by A. and J. at the    . . . C.
county court, for probate.    After lying over one month for ex-
ceptions, it was ordered of record..    Whereupon said will and
this certificate are admitted to record in my office."   HELD, that
this so-called certificate should be construed to be a copy of the
judgment of the county court admitting the will to probate;
so that the certified copy was not objectionable as evidence on
the ground that no judgment admitting the will to probate
was shown.

15. The so-called certificate was not objectionable as not showing
in whose handwriting the will was, as it was inferable that the
court had found that the instrument was in testator's writing.

16. A judgment of the county court of the county of testator's resi-
dence admitting a will to probate can not be collaterally at-
tacked.

G. W. GOURLY AND ROBERT RIDDELL, FOR APPELLANT.

H. L. WHEELER, FOR APPELLEES.
    (No briefs in the record).

OPINION OF THE COURT BY JUDGE O'REAR—AFFIRMING.

This suit was brought in equity by appellant against
appellees, Simpson Crabtree and J. M. Sullivan, in 1897,
to recover damages for certain alleged trespasses upon a
boundary of land of about 6,300 acres in Lee county, to which
appellant asserted title, and of which it claimed to be in
the possession.   Attachments were sued out by appellant
against appellees' property, for the value of the timber
cut by appellees.   The attachments were levied on a sawmill
of appellee Sullivan. and the mill, some lumber, and a num-

ber of saw logs sold under interlocutory orders of the court. As a matter of fact, the gist of this action was the alleged trespasses charged against appellees. The attachments were but ancillary to the principal cause of action. Appellees denied the trespass, justifying under a plea of *liberum tenementum*. So far as the pleading had thus far proceeded, appellant claimed to be the owner and in possession of about 6,300 acres of land, particularly bounded by metes, courses and distances. Appellees admitted cutting the timber, denied that plaintiff was the owner of that part of the land from which it had been cut, but pleaded that to the extent of that boundary, particularly described as required by section 125, Code, and containing 505 acres, defendant Simpson Crabtree was the owner. Upon this, an issue was joined. On motion of appellees, and over appellant's objection, an issue out of chancery was ordered to try the questions of title, trespass and damage. The trial resulted in a verdict of the jury finding for appellees, upon which the court dismissed appellant's petition. Its appeal involves the determination of a number of questions discussed below.

The John Carnan patent for 29,823 acres, issued by the Commonwealth of Virginia January 4, 1786, on a survey dated May 3, 1784, covers the land. It is the effort and claim of appellant to connect title with it. Appellees also claim under the same patent. Their boundary laps on that claimed by appellant to the extent of 393 acres. The particular trespasses sued for included the cutting and deporting of timber from the premises in dispute, and the building and using a tram railway across them. The land, excepting about 75 or 100 acres, was uninclosed forest. Both appellant and appellee Crabtree were in the actual possession of some parts of their respective claims, asserting title to the

extent of the boundaries called for by their respective muni-
ments. As the possession of the forest under such circum-
stances attaches to the better title, it becomes necessary to
examine not only the title deeds of the parties, but the na-
ture, extent and continuity of their holdings, as affecting the
question of limitation; each party having asserted that
his possession, coupled with adverse claim, had continued
for such length of time as to ripen into a perfect title to
the extent of the claim. After reading to the jury the pat-
ent to Carnan, appellant read a deed from Sylvanus Shum-
way to Thomas Duckham, dated September 21, 1816, con-
veying or attempting to convey all the land within the above
patent. At least, such is the construction we give to the
calls of this deed, for the transcript of the record is so im-
perfectly made as to raise some doubt as to its accuracy in
copies of some calls. There does not appear any deed to
Shumway. At points in the testimony reference was made
to a deed from Richard Champney, heir at law of Thomas
Champney, to Thomas Duckham, dated 15th of February,
1817. But the record fails to show that such deed was
offered in evidence, nor was there any conveyance from
John Carnan to Thomas or Richard Champney offered. The
next conveyance was from Thomas Duckham to Samuel
Drake, Sr., dated May 24, 1819. It embraces the same land
and other land. Then was offered a power of attorney from
Samuel Drake, Sr., to Thomas Duckham, dated August 12,
1821, empowering Duckham, as attorney in fact, to sell and
convey, let and mine, this land. Appellant then offered
a deed from Samuel Drake, Sr., by Thomas Duckham, at-
torney in fact, to Jacob Meadows, dated February 25, 1823,
the boundary of which is as follows: "Beginning at a high
pinnacle of a rock a small distance N. E. of the muster
ground in the old landing sink, at the center of the top of

the pinnacle next to the high cliff on the east side is the
one intended; thence with a line forming from the salt rock
of the Kentucky river, running with the said line N., 9 W.,
crossing Miller's creek to Valentine Crawford's north cor-
ner, a black oak, chestnut, and beech trees on the top of
the hill, and continuing the same course 18 poles to two
hickories and two sugar trees; thence N., 75 degrees east,
crossing Sodom and Gomorrah and Cave's fork of Miller's
creek, the Main Big Sinking fork of Miller's creek; thence
S., 9 degrees east, until it strikes the highest top of the
cliff of Miller's creek; thence with the high cliff southwest-
wardly on the said cliff to the beginning."   In the copy of
the deed before us the call from the two hickories and two
sugar trees, "N., 75 degrees east, crossing Sodom and Go-
morrah and Cave's fork of Miller's creek, the Main Big
Sinking fork of Miller's creek." does not give the distance.
The correct location of this line so materially affects the
solution of this controversy as to practically settle it.   An
order of survey was executed by Thomas S. Shackelford,
surveyor of Lee county, made in March, 1898.   To a correct
understanding of the matters in dispute, and some of the

evidence, it is necessary that a portion of the plat or map of this survey should be inserted, which is done.

It is the contention of appellant that its north line, when run correctly (that is, the call for the two hickories and the two sugar trees, N., 75 degrees E., crossing Sodom and Gomorrah and Cave's fork of Miller's creek, and the Main Big Sinking), is correctly shown by the line upon the plat beginning at 4, passing 28, 9, 10, and ending at 12. On the other hand, appellees claim that the correct running of this line should begin it at a point northeast of figure 27, following the line passing 27, 24, to 14. The land in controversy in this case is indicated by the boundary enclosed by the dotted line embraced by the figures 15, 16, 17, 11, 9, 25, and 18. It will thus be seen that, if the line should be run from 4 to 12, it would include about 393 acres of the 505 acres claimed by appellees, while if it should be run from 27 to 14, and thence S., 9 E., to 13, it would not touch the land in controversy, as appellant's lands lie south of the N., 75 E., line. In running the line from 4 to 12, the course N., 75 E., was not followed, but instead the line was run N., 84 E. In running the other line, it is not run either N., 75 E., but is run S., 85 E. It will thus be seen that the course is sacrificed by each of these contentions, and as the distance is not named in the deed, the controlling question must be the natural objects called for. The branch marked "Buckner or Sodom Hollow" is the one shown by the record to have been in early times called "Sodom and Gomorrah;" one fork of it being called "Sodom," and the other "Gomorrah," and below the junction being called "Sodom and Gomorrah." In running the line according to appellant's contention, the corner called for is not taken as the beginning corner, but they began at a point some poles north of the point called for as the beginning. The line

was then run, as stated, N., 84 E. In running it so, Sodom and Gomorrah was not touched, but it ran from three-fourths of a mile to a mile above that point. Nor was Cave's fork touched. Big Sinking was crossed at a point about half-way of the line, and somewhere in the neighborhood of figure 9. In running this line as contended for by appellee, the surveyor began at Valentine Crawford's north corner—a noted corner. In running that line S., 85 E., 1,380 poles from the Crawford north corner, also known as the "Meadows Corner," the line crossed Sodom and Gomorrah and Big Sinking. Though the surveyor says in his testimony that this line also touched Cave's fork, the plat, as shown on the map, fails to indicate it. It is shown that to run this line N., 75 E., it would not touch any of the natural objects called for. It is not shown that either of these lines was anciently marked. The court must therefore adopt that course that will be in harmony with the manifest purpose of the grantor, and that will carry the line in dispute by way of the natural objects; it being presumed that the parties to the transaction were more familiar with these natural objects, and less liable to be mistaken concerning them, than as to the course projected at a given angle. Such has uniformly been the ruling of the courts. Bruce v. Morgan, 1. B. Mon., 26; Bailey v. McConnell (12 R., 473) 14 S. W., 337; Ball v. Pursefull, 3 Ky. Law Rep., 396.

The testimony of one of the surveyors is that he did not cross either Sodom or Gomorrah or Cave's fork in running the disputed line as claimed by appellant. If the line should be run as contended by appellees, it would cross Sodom and Gomorrah and Big Sinking, thus fulfilling at least two of the conditions of the call, whereas, if run by

appellant's contention, it would not encounter any one of these natural objects, although it would cross Big Sinking. That course must be taken that will satisfy all or the most of the calls for natural objects, where all can not be satisfied. We do not mean to decide that the line should have stopped at the point marked "14" on the plat, but, even if it were extended on a straight line until it reached Cave's fork, still it would not embrace any of the land in controversy in this suit. We are inclined to the opinion that the true line should begin at the Meadows corner, the two hickories, and two sugar trees, and run so as to cross Sodom and Gomorrah creek so as to cross Big Sinking just below the mouth of Coal Bank Hollow, and then on till the line strikes the Cave's fork of Big Sinking. The other words in that call, viz., "the main Big Sinking fork of Miller's creek," are descriptive merely of the Cave fork; it evidently being the idea of the draftsman that Cave's fork was the main fork of Big Sinking, which is a fork of Miller's creek. From that point the line should have run S., 9 E., until the "highest top" of the sandstone cliffs were reached. We arrive at this conclusion not only for the purpose of satisfying all the conditions of the call as to natural objects designated therein, and which must be done where it is possible, and where to do so would not do violence to the other calls of the deed (and that would not occur in this case), but the evidence shows that appellant and its vendors at one time had tenants east of the S., 9 E., line, at the house marked on the plat "Harvey Williams;" that these tenants were there a great many years ago—30 or 40 years ago; and, from all the evidence, we must conclude that it was the intention and purpose of the landlords and of the tenants to take possession of that part of the lands within the boundary lines of their deeds. These acts comport with the conclu-

sion to which we have arrived as to the correct running of the N., 75 E., line.

In 1881 a conveyance was made by certain parties to C. D. Chenault and others, in which the grantor purported to convey the title derived from Duckham and Meadows, above referred to. Some time thereafter (how soon is not shown) Chenault and others caused this land to be surveyed by E. P. Benton, a surveyor formerly of Estill county. It seems that Benton was the first person to run the line as now contended for by appellant, and he marked a corner at figure 12 on the plat above as the end of that line. At that time Chenault had tenants in possession of their boundary —Blackwell, and afterwards his widow and others—but all living on the west of the line shown in the plat as the Flahaven line, and of course on the west of the N., 9 E., line. The evidence is not absolutely clear as to the extent of the claim of these tenants, but it was sufficient to have justified the conclusion that they intended to hold possession to the extent of the boundaries embraced by the deeds of their landlords, and as contended for by the landlords. This would have put appellant's vendor, Chenault, and others, in possession of the land in controversy up to the line from 4 to 12, unless appellee Crabtree was in possession of the conflicting territory. This brings us to a consideration of appellees' title and possession.

In 1869 David Pryse sold to appellee Simpson Crabtree a boundary of land within the Carnan patent, and executed a bond for title. Shortly afterwards appellee Crabtree moved upon the land embraced by this bond, and set an improvement. His dwelling is shown on the plat. He cleared some 50 or 75 acres directly thereafter, and has continued to enlarge his clearing until it now embraces about 100 acres. He continued to hold and claim under

his bond for title until in 1888, when Pryse executed a deed for the land. This deed does not follow the lines of the bond. When the parties came to make the deed, they dis-covered that the bond called for a quantity of land greatly in excess of that which the parties had intended, and so the deed was made for a boundary less than that called for in the bond, but covering all the land in controversy, namely, about 393 acres, and enough land besides, lying north of the line in dispute, to make 505 acres. The assertion of title and possession by Chenault and his associates was within fifteen years after Crabtree became seised of the possession under his title bond, and therefore before ap-pellees' title could have been perfected by possession alone.

Appellee's derivation of title through David Pryse was shown thus: (1) The patent from the Commonwealth of Virginia to John Carnan for 29,823 acres. (2) A deed from John Carnan to Thomas Flahaven, dated 10th of May, 1793, conveying 17,823 acres, or "the eastermost part of the 29,-823-acre tract." This line was established and shown by the testimony of witnesses who proved its existence by rep-utation as an ancient line, which evidence was competent for that purpose. Smith v. Prewit, 2 A. K. Marsh., 157; Same v. Nowells, 2 Litt., 160; Same v. Shackelford, 9 Dana, 468; Beaty v. Hudson, Id., 322. The western line of this Flahaven tract, by the conveyance just mentioned, is the line shown on the plat from 5 to 22; the deed embracing all the lands shown on the plat east of that line. (3) Thom-as Flahaven on July 4, 1806, mortgaged this land to Mich-ael Fishell and A. Gallatin, of Lexington, to secure 770 Spanish milled dollars loaned. In a suit in the Estill circuit court to foreclose this mortgage, a commissioner's deed. as a result of a decretal sale in that action, was made on the 21st of October, 1827, by Robert Clark, commission-

er of the Estill circuit court, conveying to Michael Fishell. A copy of that record was introduced in support of the deed. In a suit in the Fayette circuit court pending as early as 1833, Thomas Duckham, and the heirs of James Haggin respectively litigated with Michael Fishell their claim to redeem each a moiety of the land bought by Fishell at the decretal sale evidenced by the deed of Clark, commissioner, above referred to. The case lingered upon the docket many years; numerous parties having been interpleaded, and the cause having come to this court two or three times. While the case was pending, Mary Gilman's executor, Peck, was prosecuting an action in the Montgomery circuit court against Michael Fishell's executor, in which the complainant was seeking relief against Fishell, Haggin and Duckham with reference to the sale just above mentioned. By the decree in that case it is shown that Michael Fishell had assigned to Thomas Duckham and James Haggin the Flahaven mortgage, in consideration of $1,100. On the 25th of March, 1825, Fishell made a contract with Mary Gilman for one-half of the mortgage debt, and land embraced in the mortgage, and transferred one-half of his interest in the claim he held on Duckham and Haggin. It was recited that Fishell and Mary Gilman filed their bill in the Fayette circuit court against Haggin and Duckham to rescind the contract of Fishell with them, and that on the 11th of February, 1831, Haggin and Fishell made another contract, in which they recited that Mary Gilman had become the owner of one-half of the contract between Fishell and Haggin and Duckham, and that, in the sale by the commissioner of the Estill circuit court, Fishell had purchased, in reality, for himself and Mrs. Gilman. Peck, as executor of Mary Gilman, therefore sought a decree against Haggin's heirs and Duckham for one-half of the price cov-

enanted to be paid by them to Fishell by the contract of 1831. The court decreed to Peck, as executor of Mary Gilman, that he recover of Haggin's heirs one-half of the money, instead of the land bought at the decretal sale, and directed that execution might issue accordingly. Duckham's interest was also sold by decree of the court. That decree against Haggin's heirs was affirmed by this court at the winter term, 1849. Haggin's Heirs v. Peck, 10 B. Mon., 210. Upon the decree of the Montgomery circuit court in favor of Peck, executor of Mary Gilman, against Haggin's heirs, just referred to, two executions issued, directed to the sheriff of Owsley county, who levied upon the interest of Haggin's heirs in the land above named, and who sold this land (that is, Haggin's heirs' interest therein), and the same was purchased by Mrs. E. B. Peck, and was conveyed to her by the deed of J. Hacker, sheriff of Owsley county, on the 28th of September, 1852. The records of the suit in the Montgomery circuit court are lost. It is proven by the testimony of Maj. A. T. Wood, an attorney of the bar at Mt. Sterling, that the courthouse had been burnt twice within his recollection—once in 1852, and again in 1863. He witnessed both the burnings. The records of the circuit court clerk's office, excepting a few record books, were destroyed. The circuit court clerk also proved the absence of the records anterior to 1852, and in the absence of such records, under the circumstances, the law will presume that the decree which was proven by the clerk (the order book containing it not having been destroyed) was supported by proper antecedent proceedings. In the suit above referred to in the Fayette circuit court, in the case of Thomas Duckham against Michael Fishell, and Gilman's executor against Haggin's heirs, and Haggin's heirs against Duckham,—all being one and the same cause—on October

11, 1852, there was an order or decree for the partitioning of the lands above mentioned and in controversy; that is the land derived by Flahaven from Carnan, and mortgaged by Flahaven to Fishell, and purchased by Fishell at the commissioners' sale. The commissioners appointed were Thomas Hart, E. L. Cockerill, and Bowles Harris. These commissioners reported; dividing the lands into moieties between Haggin's heirs and Daniel Breck, setting apart to Samuel Beatty a tract supposed originally to contain 313 acres, and some other conveyances not of importance to notice here. The court had directed a partition between Haggin's heirs and Hon. Daniel Breck of the remaining land embraced by the Flahaven deed, giving to each one moiety by metes and bounds. It was the land so set apart to the Haggin heirs that was sold by sheriff Hacker of Owsley county under the execution in favor of Peck above referred to. Prior to the partition proceedings just mentioned, the Montgomery circuit court, in the action previously mentioned as pending therein, had conveyed to Daniel Breck, as the result of a decretal sale, the interest of Thomas Duckham in the Flahaven tract of 17,823 acres; being the interest that was sold by Mary Gilman to Thomas Duckham. We understand that the land embraced in the partition to the Haggin's heirs is that land lying between the Flahaven line and the McGuire line, shown on the plat herein. The land set apart to Breck lies east of the McGuire line. With it we do not feel called upon to further concern ourselves in this litigation, as it does not appear to cover any of the land in dispute. Mrs. Peck conveyed the land embraced by the deed from the sheriff to her by deed dated December 17, 1852, in which she conveys the land to James M. Barclay, trustee for the heirs of the late James Haggin, with power to sell and convey it. On the 17th of October, 1858,

Barclay, trustee, conveyed this land to Samuel Beatty, Price Pryse and John Jones. John Jones conveyed his interest on the 2d of October, 1869, to Thomas D. Ballard, who conveyed it on the 13th of December, 1869, to E. M. Pryse. R. H. Crittenden, United States mashal for the district of Kentucky, conveyed to David Pryse the interest of E. M. Pryse by deed dated 31st of December, 1879; the interest of E. M. Pryse having been sold at a marshal's sale under an execution of Tolle, Holton & Co., against E. M. Pryse and others, issued upon a common-law judgment in the circuit court of the United States for the district of Kentucky; profert of copy of the record being made. Samuel Beatty conveyed his interest in this land to David Pryse by deed of 20th of May, 1876. Price Pryse, by will probated January, 1865, devised his interest in this land to David Pryse. Thus appears a perfect chain of title from the Commonwealth of Virginia to the appellee Simpson Crabtree for the land in controversy. It follows that the possession of appellee Crabtree, being coupled with that of the superiority of the title, was not disseised by the adverse claim of appellant, holding under the Chenault title; Chenault's tenants not living within, or having any inclosure within, the land in dispute., McLawrin v. Salmons, 11 B. Mon., 98 (52 Am. Dec., 563.)

The circuit court refused to allow appellant's deeds to go to the jury as evidence of title, restricting their use to showing extent of claims and possession. This is objected to by appellant, and alleged as an error. We are of opinion that this ruling was right. If appellant had connected with the Commonwealth, or the origin of title to the land, it would have been proper to have submitted the mesne and all its conveyances as evidence of its title, but without such connection it must depend for title, not upon the vir-

tue of the conveyances, but upon its and its vendors' possession thereunder.  Orr v. Foote, 10 B. Mon., 393.

In addition to the 393 acres claimed by appellee Crabtree, there was also in question the tract embraced in the triangle formed by the figures 9, 10 and 11, and being 27 acres, from which some of the timber in controversy had been cut by appellee Sullivan.  It is earnestly insisted for appellant that it was at least entitled to recover for this timber, as appellees had shown no title or claim thereto. It is sufficient response to this to say that, in view of the conclusion to which we have arrived concerning appellant's title, it did not own the 27 acres, and was not in possession of it.  For whatever may be the state of its title with respect to the lands embraced by the lines of the Meadows deed, as indicated by this opinion, we find from the record that those claiming under the Flahaven conveyance and under Haggin's heirs have had tenants in possession of some parts of that boundary for such a length of time as will have prevented the possession of appellant's tenants since the Chenault deed from including the 27 acres.  The possession of any part of the tract under the better title extends to the whole boundary and claim therein, except to such part as may be in the adverse, actual possession of another.  This adverse actual possession will not be construed to attach to the claim of tenancy under the junior holding, where it is not inclosed, and where the entry under the junior grant is not within the conflict. Layson v. Galloway, 4 Bibb, 100; Lee v. McDaniel, 1 A. K., Marsh, 234; Shrieve v. Summers, 1 Dana, 239; McGowan v. Crooks, 5 Dana, 69; Gregory's Heirs v. Ford, 5 B. Mon., 478; Jones v. McCauley's Heirs, 2 Duv., 14.

The answer of appellees in this case, as has been stated, justified their cutting of the timber and the building and

operating of the tramway by virtue of the title of appellee Crabtree, derived from David Pryse by the deed of 1888. Appellees did not, in their answer, deny the title of plaintiff to any part of the boundary described in appellant's petition, except that embraced in the deed from Pryse to Crabtree. At the close of appellant's evidence, appellees tendered and offered to file an amended answer, in which they deny that plaintiff was the owner of any of the land described in its petition. So far as this case is now concerned, the issue tendered by this amendment affects only the 27 acres above referred to, as that is the only land claimed by the plaintiff, outside of Crabtree's deed, from which it is charged that appellees have cut any part of the timber sued for. The court, over the objection of appellant, permitted this amendment to be filed, whereupon appellant filed the affidavit of one of its officers, setting forth its surprise at the change of the issue thus presented, and its unpreparedness to meet the new form of issue, and moved the court to set aside the swearing of the jury and to continue the cause. The motion was overruled, and the trial proceeded. The affidavit of appellant's agent, McConnell, filed to procure a continuance on the ground of surprise, relied upon these facts: That in view of the state of pleading at the commencement of the trial, appellant did not feel called upon to prove any more of its title than was necessary to cover the land embraced by the deed from Pryse to Crabtree; the title to the remainder being admitted by a failure to deny; therefore it had not prepared itself with evidence of its title, in certain particulars, as to its "outside boundary." We will notice these particulars. It was asserted that plaintiff company could have procured the original deed from Jesse Daniel to S. D. Martin; also copy of the will, and probate thereof, of the late Judge John M.

Elliott; also that it could prove that the only heirs of Ed·
ward Williams were William Williams, John Williams, and
Jennie A. Bell; also that it could procure the original title
bond executed by Dr. Samuel D. Martin to Edward Will-
iams for an interest in the land in dispute.  The materiality
of the foregoing facts can be apparent only upon an under-
standing of the mesne conveyances constituting appellant's
chain of title.  In view of the fact that appellant fails to
connect with the Commonwealth, we have not deemed it
necessary to trace its derivation of title further than has
been done.  These mesne conveyances are important only
for the purpose and to the extent, in the state of case pre-
sented here, of showing the transfer and continuity of the
possessory title allowed to go to the jury.  To more read-
ily understand the rulings hereon, we will say that appel-
lant's claim of title presented begins with the deed from
Shumway to Duckham, above referred to; then deed from
Duckham to Drake; power of attorney from Drake to Duck-
ham; deed from Drake, by Attorney Duckham, to Jacob
Meadows—all discussed above.  Meadows conveyed a por-
tion of the same land to Daniel Smothers.  Daniel Smoth-
ers conveyed to Jesse Daniel two-thirds of his title, and
one-third to Martin Haggard and Silas Evans.  Jesse Dan-
iel conveyed his two-thirds interest to Samuel D. Martin.
Silas Evans conveyed one-half of his interest to John Sid-
ney Evans and Samuel F. Taylor.  The deed recites that he
had previously conveyed the other half to Roger W. Han-
son.  John Sidney Evans' will devised his interest in this
land for life to his widow; the remainder to his nephew,
Oliver P. Evans, with power to the wife to sell for her sup-
port.  Then follows a deed from one John S. Evans to Rob-
ert Riddle, John M. Elliott and Joseph Blackwell, for his
one-third interest in the land "devised him by John S.

Evans, deceased." The consideration named was a payment made to "the grantor's father, C. C. Evans." There is no proof offered as to the relationship of this John S. Evans to Oliver P. Evans, to whom was devised an interest in this property by John Sidney Evans. From the recitals in the deed, it might be inferred that the grantor was a son of Oliver P. Evans; the initials O. C. being a mistake in the copy. One Sid E. Baxter conveys his one-third interest in the land derived from John S. Evans, deceased. How he came by the interest is not known. It was the purpose of appellant, as shown by the affidavit for a continuance, to supply the following defects, real or supposed, in appellant's chain of title, existing as the matter stood before the jury at the close of plaintiff's testimony: (1) The deed from Jesse Daniel to S. D. Martin. That had already been introduced, and doubtless had been overlooked in the preparation of the affidavit. (2) The will of Judge John M. Elliott, devising his interest in this property to his widow, Susan J. Elliott; Mrs. Elliott having conveyed by deed to appellant's immediate grantor. She could have conveyed only what John M. Elliott had obtained under the deed from John S. Evans. (3) To show the relationship of the Williams heirs to Edward Williams. (4) To produce the original title bond from Samuel D. Martin to Edward Williams. It will be remembered that Samuel D. Martin had obtained by a deed from Jesse Daniels two-thirds of the Daniel Smothers title, and appellant claims that Samuel D. Martin had, by bond, sold and agreed to convey this two-thirds interest to Edward Williams about 1855. It is not claimed that the deed was ever made in satisfaction of this bond. William Williams, John Williams and Jennie A. Bell (formerly Jennie A. Williams), claiming to be the sole heirs at law of Edward Williams, deceased,

conveyed their interest in this land in 1881 to C. D. Chenault and associates. It was for an opportunity to prove the heirship of these grantors the postponement was, in part, asked for. If it should be admitted that all of the matters which appellant expected to, and asserted by the affidavit that it could, obtain in perfection of its chain of title, had been presented to the jury, we are of opinion that it could not properly have changed the result of the trial. For at the utmost it would have tended merely to complete appellant's chain of title derivable from the Jacob Meadows deed, and as we have found that the Jacob Meadows deed did not cover the land in contest, and as none of these conveyances purport or are alleged to embrace more land than did the Jacob Meadows deed, we conclude that the court did not err in refusing to set aside the swearing of the jury and continuing the case. And in view of the further fact that appellant did not show itself to own the remainder of the land from which the timber in dispute was cut, to-wit, the 27 acres, and of the fact that appellees have shown affirmatively that appellant did not own it and was not in possession of it, the court did not abuse a sound discretion in permitting the amended answer to be filed at the time it was done. At least, no substantial right of appellant has been prejudiced by the practice questioned.

Further complaint is made by appellant that the court directed a trial by jury, instead of trying the case in equity. The only matter presented in issue by the pleadings that was cognizable in equity under any circumstances was as to the mistake in one of the lines of the deed from Pryse to appellee Crabtree. The deed, as it appeared, covered the 27 acres above referred to. An issue was made as to whether this had not been changed by fraud or mistake. Before referring the case to the jury, the court, from the

evidence, found (and we think correctly found) that there had been an unwarranted change in one of the lines of the deed, and corrected same so as to exclude the 27 acres from the deed. Thereafter the cause was properly a common-law action, and should have been tried by a jury upon the demand of either party.

Another contention made by appellant is that it and appellees both claim title through one common grantor, to-wit, Thomas Duckham, and that therefore it was not incumbent upon appellant to trace its title further than to the said Duckham. We concede that this is a general rule. We are of opinion, however, that it can not be applied in this case for the following reasons: If Duckham owned any title to the land when he conveyed to Drake, he parted with it in May, 1819. Afterwards he purchased another title, subject to the lien of its vendor for the purchase money, and that occurrence was this: Flaharen had mortgaged the land, as has been stated, to Fishell and Gallatin. Fishell foreclosed the mortgage in Estill, and bought in the land. It was shown in the suit in Fayette that in fact Mary Gilman was the joint owner with Fishell in that enterprise, and that Fishell had in reality bought for their joint account, and that she was entitled to a half of the land so bought. Fishell sold his interest to Haggin, and Mary Gilman sold her moiety to Duckham, for which Duckham agreed to pay a certain sum, "to be paid in stone coal, and in cedar, yellow pine, chestnut and walnut shingles." Duckham failed to pay, and in the suit in Montgomery county by Mary Gilman's executor, Peck, Duckham was made a party, and the purchase-money lien of Mrs. Gilman was enforced. At that decretal sale Judge Breck became the purchaser. Breck therefore derived title not through Duckham, properly speaking, but through Mrs. Gilman, for Duck-

ham never had the title.   He merely had a bond for a title, the condition of which he had failed to comply with.   It can not be truly said, therefore, that appellant and appellees claim from the same common source, to-wit, Duckham's title.   The doctrine that a warrantor, after acquiring title, will be held, by estoppel, to have acquired it for his first vendee, can have no place in this case, because the warrantor's title (Duckham's) in this instance acquired by the contract with Mrs. Gilman, was but an equitable one, subject to be defeated by the superior equity of his vendor's lien for purchase money; and, as it was in fact extinguished by the enforcement of that lien, Duckham's warrantee could take nothing by the latter transaction.

Numerous objections are made to the admission of evidence at the trial.   None of them are serious enough, however, to note, further than to say that in our opinion the circuit court ruled correctly thereon.   We will notice the following particularly:   The deed from James M. Barclay, trustee, to Beatty, Pryse and Jones was signed, "James M. Barclay."   The certificate of acknowledgment is: "State of Kentucky, Fayette County—sct.:   I, Sanders D. Bruce, clerk of the county court of the aforesaid, do certify that this deed from James M. Barclay to Samuel Beatty and others was this day produced to me in my office by the said John L. Barclay to be his act and deed, and ordered to be certified, which is hereby done.   Given under my hand this 7th day of October, 1858.   [Signed] Sanders D. Bruce, C. F. C. C., by Hauflet Richardson, D. C. C., F. C. C."   All language in legal documents must be given some meaning in law, where it is possible to do so.   The act of this officer would be meaningless, as would all of his words employed in this certificate, unless we should be able to gather from it the following facts:   It was the purpose of the

clerk to certify the deed so as to entitle it to record. When he said that it had been acknowledged by the "said" Barclay, we must hold that he referred to the person who had actually signed the deed, and whose name appeared thereto, and that the words "John L" are but a mistake in the transcript. The phrase that this deed "was this day produced to me in my office by the said John L. Barclay to be his act and deed, and ordered to be certified," necessarily implies that the said Barclay acknowledged the instrument to be his act and deed. This is the only way in which any effect could be given to this instrument. In the deed from Samuel Beatty and Patience Beatty, his wife, to E. M. Pryse, substantially the same objection is made as to the form of the certificate, and the comments above apply.

The will of Price Pryse bears date July 28, 1864. The clerk of the county court of Owsley county, which the testator states in his will was the county of his residence, certifies that the copy of the will is a true copy, as is "certified of record, which appears from the records of this office." The certificate is as follows: "State of Kentucky, County of Owsley—sct.; I, E. Winn, clerk of the county court of the county aforesaid, do certify that the foregoing writing, the last will and testament of Price Pryse, deceased, was produced and handwriting proven by A. B. McGuire and J. B. Phillips at the October term of the Owsley county court, for probate. After lying over one month for exceptions, it was ordered of record. Whereupon said will and this certificate are admitted to record in my office." The objections to this form of certificate are that it does not show in whose handwriting the instrument was, and that there must have been a judgment of the county court of Owsley county admitting the paper to

probate. We construe the form above, which is called a "certificate," to be a copy of the judgment of the county court ordering the will to probate. There are no attesting witnesses to the instrument, and, from the language used in the judgment, we must conclude that the court found that it was wholly in the handwriting of the testator; and, while this fact was necessary to have been proven in order to admit the document to probate as the will of Price Pryse, we must conclude that it was proven, because of the fact that it was admitted as his will, and ordered to record as such. It is the solemn judgment of a court of competent jurisdiction, and can not be collaterally attacked. Reed v. Reed, 91 Ky., 267 (12 R., 867) (15 S. W., 525, 11 L. R. A., 513); Mitchell v. Holder, 8 Bush, 362; Moore v. Tanner's Adm'r, 5 T. B. Mon., 42 (27 Am. Dec., 35); Abbott v. Traylor, 11 Bush, 335; Miller v. Swan, 91 Ky., 36 (12 R., 629) 14 S. W., 964.

The instructions of the court fairly presented the law to the jury. We perceive no error in the trial in the circuit court prejudicial to the substantial rights of appellant. The judgment is affirmed.